UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

**DECISION AND ORDER**

v.

1:12-CR-00125 EAW

MARTIN RHYS JONES,

Defendant.

## I.   **INTRODUCTION**

Defendant Martin Rhys Jones ("Defendant") is charged in a 40-count indictment with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. §§ 1957(a) and 2, and 18 U.S.C. §§ 1956(a)(2)(A) and 2.  (Dkt. 1).  Presently before the Court is Defendant's motion requesting release from custody, which is on appeal from the Decision and Order issued by the Honorable Hugh B. Scott, United States Magistrate Judge, on August 4, 2015.  (Dkt. 354 & 357).  Defendant also moves for a severance. (Dkt. 357).

Although the Court agrees with the Magistrate Judge's Decision and Order that Defendant plainly presents a risk of flight, the Court finds, based on additional information brought to its attention regarding Defendant's ability to remain in the United States pending trial, that there are conditions that reasonably will assure the presence of Defendant if he is released.  As a result, the Magistrate Judge's Decision and Order

- 1 -

denying Defendant's motion for release from custody without prejudice is reversed. The Court will allow Defendant to be released pending trial in this matter with the following conditions:

1.  Defendant shall post a seventy-five thousand dollar ($75,000) cash bond fully secured by cash deposited with the Clerk of the Court;

2.  Defendant shall report within 24 hours of release and as directed by the U.S. Probation Office ("USPO");

3.  Defendant shall avoid all contact, directly or indirectly, with any person(s) who are or who may become a potential victim or witness in this case;

4.  Defendant's passport shall be surrendered to the Clerk of the Court and Defendant shall not obtain a new passport or other international travel documents;

5.  Defendant shall be required to remain in the United States as approved by the Department of Homeland Security, and his travel shall be restricted to within Erie County, New York, unless Court permission is granted to travel elsewhere;

6.  Defendant shall reside at the Buffalo City Mission ("BCM") and comply with all rules, regulations and conditions as directed by the BCM staff, or at such other alternative verifiable address as approved by the Court and he shall not move without prior approval of the Court;

7.  Defendant shall abide by all conditions of the Home Confinement Program to be monitored electronically in a manner to be approved by the Court and/or the USPO, he shall be subjected to home detention, and he shall contribute to the cost of services (co-pay) in an amount to be determined by the USPO;

8.     Defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with electronic monitoring which is required as a condition of release;

9.     Defendant shall not possess any firearms or other destructive devices; and,

10.     Defendant shall report within 72 hours, to the USPO any contact with any law enforcement personnel, including but not limited to any arrest, questioning or traffic stop.

In addition, for the reasons set forth below, the Court denies Defendant's motion to sever without prejudice.

## II.    PROCEDURAL HISTORY

Defendant was indicted on April 17, 2012.  (Dkt. 1).  However, it was not until almost one year later that Defendant was arraigned, on March 4, 2013 (Dkt. 76), because Defendant resided in Spain and he opposed extradition (Dkt. 341 at 1-2).  According to Defendant, he was arrested in Spain on May 17, 2012, and he has been held in custody since that date (albeit for almost one year outside the United States). (Dkt. 357 at 4).

E. Carey Cantwell, Esq., was appointed to represent Defendant, who pleaded not guilty to all counts of the Indictment.  (Dkt. 76 & 77).  At the arraignment on March 4, 2013, the Government moved for detention, and Defendant did not oppose pretrial detention as he had no legal status in the United States. (Dkt. 76).

During the time period of 2013-2014, Defendant joined his co-defendants in requesting extensions of time to file pretrial motions on several occasions.  (Dkt. 84 & 86; Dkt. 124 & 140; Dkt. 187; Dkt. 249 & 250).  Further, Defendant moved to designate

this case as a "mega-case" in May 2013 (Dkt. 93), and the case was so designated in July 2013 (Dkt. 107).

In August 2014, Defendant was scheduled to accept a plea offer (Dkt. 218); however, the parties hit multiple stumbling blocks, and the plea did not go forward (Dkt. 231, 236, 239, 260). Earlier this year, on January 8, 2015, Defendant for the first time expressed his desire to forgo filing pretrial motions, and proceed immediately to trial. (Dkt. 274). At a status conference on April 8, 2015, Defendant again expressed his desire to promptly proceed to trial. (Dkt. 316).

On June 30, 2015, Defendant filed a motion for release from custody, for a speedy trial, and to sever, before Magistrate Judge Scott. (Dkt. 337). Defendant requested that he be released from custody on a $250,000 bond, secured by up to $100,000 cash, and that he be permitted to reside in the United Kingdom pending the trial of this action. (Dkt. 337 at 3; Dkt. 354 at 1). On August 4, 2015, Magistrate Judge Scott denied Defendant's motion for release from custody without prejudice, with leave to renew after March 1, 2016, which would be approximately 36 months after Defendant was first detained in the United States. (Dkt. 354 at 21). Magistrate Judge Scott deferred judgment to this Court on Defendant's motion to sever. (*Id.* at 20).

On August 18, 2015, Defendant filed objections to Magistrate Judge Scott's Decision and Order. (Dkt. 357). Defendant represented that his relatives were willing to post $100,000 cash, to secure a $250,000 bond. (*Id.* at 5). Specifically, Defendant represented that his parents were "willing to post $50,000 in addition to his brother who will also post $50,000 for a total of $100,000 to secure a bond of $250,000." (*Id.*).

Defendant also attacked the Magistrate Judge's finding that Defendant's financial situation was unknown, citing to Defendant's qualification for appointed counsel, although Defendant did not make any further submissions concerning his financial assets. (*Id.*). Defendant represented that, if released, he would live with his parents in the United Kingdom, who "consent to the monitoring of their home." (*Id.*).

The Government responded on September 1, 2015, opposing Defendant's requests for release on bail and severance. (Dkt. 360). Oral argument was held on September 18, 2015. (Dkt. 369). At that appearance, the Government indicated that it opposed granting Defendant bail that would allow him to leave the United States, but it agreed that if Defendant remained within the United States, cash bail in the amount of $100,000, along with electronic monitoring, travel restrictions, and other appropriate restrictions, would constitute reasonable conditions that would minimize Defendant's risk of flight. The Court instructed the Government to investigate the opportunity for Defendant to remain in the United States pending trial if released.

On September 25, 2015, the Government advised the Court by letter that according to the Department of Homeland Security, Defendant may be eligible to remain in the United States pending trial. Thereafter, the Court held a status conference on October 7, 2015. (Dkt. 372). At that appearance, the Government confirmed that Defendant had been paroled into the United States when the extradition proceedings brought him to this country, and unless the Government objected, Defendant would remain in parole status and could remain in the United States not subject to deportation until the proceedings in the above-captioned matter were completed. Defendant would

not be authorized to work in the United States during this time period, and Defendant would be responsible for his own costs of living including locating suitable housing.

Defense counsel represented at the appearance on October 7, 2015, that while Defendant's family members believed they could post $100,000 cash to secure Defendant's release, they would not be able to financially support the Defendant while he remained in the United States. The Court explored at that appearance whether some of the funds that the Defendant's family had identified as being available to post bail could instead be used to pay Defendant's living expenses while he remained in the United States (with a lower amount than $100,000 being set as bail), and defense counsel indicated that he would need to contact Defendant's family to ascertain their position on that issue. The Government indicated at that appearance that it would remain reasonable and flexible in its position as to the financial security required for bail, particularly if Defendant was required to pay for his living expenses while remaining in the United States. The Court indicated that it would be requesting an updated pretrial report from the USPO, and advised that it would issue a decision thereafter.

By memorandum dated October 15, 2015, the USPO recommended against releasing Defendant concluding that "[t]here is no condition or combination thereof that can reasonably assure either the defendant's appearance in court or the safety of the community." However, in the event that the Court was inclined to nonetheless release Defendant, the USPO proposed various conditions, including $100,000 cash bail, electronic monitoring, requiring Defendant to remain in the United States, relinquishing Defendant's passport, home incarceration, and restricting travel to Erie County, New

York.  In addition, at the Court's direction, the USPO explored alternative housing arrangements that would be potentially available to Defendant if released, and ascertained that Defendant would be eligible to reside at the BCM as he would be considered "homeless" upon his release from custody.  There would be no financial cost imposed on Defendant for residing at the BCM, although he would be required to complete tasks and duties as assigned by BCM's staff and comply with all their rules and regulations.

In the meantime, however, on October 14, 2015, Defendant's attorney communicated with the Court that Defendant's family would refuse to offer funds for bail if he was required to remain in the United States.

## III.   DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY

There is no information or credible suggestion in the record before the Court that Defendant should be detained because he presents a risk of danger to others or the community.  The underlying crimes alleged in the Indictment are financial crimes, related to an alleged scheme by Defendant and others to sell restricted stock over-the-counter as freely traded shares, without telling investors about the stock restrictions.  Defendant and co-defendant Wrobel were the alleged masterminds behind the alleged $5 million fraudulent scheme, at least according to the Indictment.  The Government represented to the Court during the appearance on September 25, 2015, that the alleged victims are not located within the Western District of New York (or the United States).  There is no record of any violent behavior on the part of Defendant, and the Government has not argued that Defendant should be detained on this ground.  Thus, while the USPO memorandum to the Court dated October 15, 2015, makes a passing reference to the

recommendation that Defendant be detained because there are no conditions that would assure the safety of the community, the Court will evaluate (as did Magistrate Judge Scott) Defendant's request to be released on bail based upon his risk of flight.

### A.   THE GOVERNMENT HAS DEMONSTRATED BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANT IS A FLIGHT RISK.

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person such as Defendant pending trial are set forth at 18 U.S.C. § 3142. *United States v. Vasquez*, 113 F.3d 383, 388 (2d Cir. 1997). A defendant awaiting trial must be released unless the release will present a risk of flight or dangerousness, or both, and no set of conditions can reasonably eliminate those risks. *See* 18 U.S.C. § 3142.

The factors that a court must consider in making this determination include the following: (1) the nature and circumstances of the charged offenses; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including such matters as the person's family ties, employment history, length of residence in the community, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of any risk of danger if the person is released. *See* 18 U.S.C. § 3142(g); *see also United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When

making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001), *aff'd*, 21 F. App'x 66 (2d Cir. 2001).

There is a two-step inquiry with respect to risk of flight. "First, the court must make a finding as to whether the defendant presents a risk of flight if not detained. Second, if the court finds that a defendant is likely to flee, then the court must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released." *United States v. Shakur*, 817 F.2d 189, 194-95 (2d Cir. 1987) (citations omitted).

In support of its position that Defendant presents a risk of flight, the Government submits: (1) Defendant is a citizen of the United Kingdom with no legal status in the United States and no ties to this country; (2) unlike some of his co-defendants who are foreign nationals whom the Government has not opposed their release, Defendant in this case did not voluntarily come to the United States but rather opposed extradition; (3) Defendant was a key player directing the alleged criminal operation and purportedly controlled the $5 million in criminal derived proceeds; (4) Defendant allegedly "jumped bail" from a criminal prosecution in the United Kingdom, related to a scheme nearly identical to the instant case; (5) Defendant would face a lengthy jail sentence if convicted – the sentencing guideline calculation set forth in the government's Pimentel statement indicated a sentencing range of 292 to 365 months with acceptance of responsibility; and (6) Defendant previously used aliases and had possible access to funds to finance

attempts to defeat government efforts to return him to the United States. (Dkt. 360 at 6-7).

Magistrate Judge Scott determined that the Government easily demonstrated by a preponderance of the evidence that Defendant posed a risk of flight, and based upon its *do novo* review, the Court readily agrees with that determination.

Defendant faces serious charges involving a multi-million dollar scheme with hundreds of victims; the strength of the Government's case appears strong; Defendant is facing a significant period of incarceration if convicted; Defendant previously refused to voluntarily produce himself to face these charges in the United States; and Defendant has no ties to the United States and no legal status in the United States. There is also evidence that Defendant has used aliases in the past, and while Defendant is being represented by court-appointed counsel, the details of Defendant's financial situation are vague.

In addition, Defendant appears to have evaded prosecution for a similar alleged scheme in the United Kingdom. Even according to Defendant's version of events, he was arrested in the United Kingdom in February 2012; although no formal charges were filed, Defendant was released "on bail" with a duty to return; his United Kingdom passport was seized and he was instructed to remain in the United Kingdom and reside at his ex-wife's residence in that country. (Dkt. 357-1). Instead, Defendant failed to show up at his ex-wife's residence, instead immediately returning to Spain without his passport. (*Id.*).

Defendant challenges the Government's and Magistrate Judge's reliance upon his violation of this so-called "police bail" or "pre-charge bail" arguing that the restrictions

placed on Defendant would no longer be legal in the United Kingdom, because the law has been changed so that there is now a 28-day limit on the pre-charge restrictions that were placed on Defendant, whereas Defendant's restrictions were imposed for 90 days. (Dkt. 357 at 4 n.1). However, "police bail" is still legal in the United Kingdom, and even though the time limits may have changed, it is a practice apparently utilized in the United Kingdom. Defendant was not even able to comply with the "police bail" restrictions for one day, let alone 28 days or 90 days. The issue is not whether "police bail" would be legal in this country or whether it is subject to controversy in the United Kingdom – the issue is that Defendant plainly ignored instructions from authorities in the United Kingdom and immediately returned to Spain without his passport.

Based upon the facts set forth above, the Court finds that Defendant is a flight risk under the standards established by 18 U.S.C. § 1342.

## B.  THE DETENTION IS NOT YET CONSTITUTIONALLY EXCESSIVE.

Before addressing whether there are conditions that would reasonably minimize Defendant's risk of flight and assure his appearance, the Court will briefly address Defendant's argument that even if the Bail Reform Act does not authorize his release, he must be released because the length of his detention, which at this date stands at approximately 32 months in the United States, is constitutionally excessive. (Dkt. 357 at 7). In *United States v. Millan*, 4 F.3d 1038 (2d Cir. 1993), the Second Circuit Court of Appeals discussed the framework by which a district court assesses whether pretrial detention has become unconstitutional. "To determine whether the length of pretrial

detention has become constitutionally excessive, we must weigh three factors: (i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based, that is, the evidence concerning risk of flight and danger to the safety of any other person or the community." *Id.* at 1043 (internal quotations and citation omitted).

1.    Length of the Detention

Defendant has been detained in the United States since his arrest on March 4, 2013. (Dkt. 76). Pretrial motions have not been filed, and as a result, a trial date has not been scheduled. Accordingly, by the conclusion of the trial, Defendant will have been detained in excess of three years without any formal finding of guilt.

Although the Second Circuit Court of Appeals has held that detentions exceeding 30 months do not violate the due process clause, it has expressed significant reservations regarding lengthy periods of pretrial detention. *See Millan*, 4 F.3d at 1044 (where by time of trial, the defendant will have been detained between 30-31 months without a formal finding of guilt, detention did not violate due process). *See also United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012) (26-month pretrial detention did not violate due process, but warning district court that it was "disturbed" by the long detention and stating that the defendant could recall the mandate if the court did not start trial by a certain date or set reasonable bail); *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (30-33 month detention does not violate due process, where the defendant allegedly had a role in a worldwide terrorist organization and was dangerous to the United States, because "longer pretrial detention is more justifiable for a defendant found

to be dangerous than for a defendant who presents only a risk of flight."); *United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) (projected time of detention of 27 months does not violate due process, but noting that if trial was substantially delayed, the defendant could renew his motion, and stating that it "[did] not intend to suggest that [the defendant's] pretrial detention may continue indefinitely."); *United States v. Hill*, 462 F. App'x 125, 127-28 (2d Cir. 2012) (24 months did not violate due process, but noting that the defendant could move to recall the mandate if the district court did not begin the defendant's trial or release him on bail on or before July 1, 2012, the point at which his detention would have exceeded the 30-month period previously identified as "extraordinary"); *United States v. Rounds*, No. 15-2767-cr, 2015 U.S. App. LEXIS 18893, at *1-3 (2d Cir. Oct. 30, 2015) (pretrial detention lasting over five years, while "troubling," did not violate due process, where trial was scheduled to start 14 days after the defendant's appeal was submitted for consideration, reason for delay was largely the fault of the defendant, and the defendant was accused of crimes carrying a maximum penalty of life in prison).

At this point of the proceedings, Defendant has been in custody in the United States for 32 months. And as Magistrate Judge Scott pointed out, the Government has not accused him of crimes of violence. Moreover, the parties seem to agree that the case is nowhere near being trial ready; in fact, a two-month extension of the pretrial motion deadline was recently granted. (Dkt. 377). The Court finds, as did Magistrate Judge Scott, that this factor weighs in favor of Defendant.

2.     Extent of the Prosecution's Responsibility for the Delay of Trial

There is no evidence in the record suggesting that the Government is responsible for the delay.   The Court appreciates that Defendant has argued that the voluminous discovery contains, in many respects, irrelevant material, but the record cannot support a conclusion that the Government is responsible for the delay of the trial, particularly where by its nature cases with voluminous documents will necessarily encompass irrelevant materials as part of any document production.   Further, Defendant himself consented to and requested extensions during the first two years that this case was pending.   (Dkt. 84 & 86; Dkt. 124 & 140; Dkt. 187; Dkt. 249 & 250).   Indeed, it appears that Defendant's extradition proceedings were responsible, at least in part, for some of the delay in this case.   (Dkt. 44 at ¶ 2 (Defendant Klein's motion for extension of time to file defense motions citing, in part, reason for request as pending extradition of Defendant)).   As a result, the Court finds that this factor weighs in favor of the Government.

3.     Strength of the Evidence Upon Which Detention is Based

For the same reasons that the Court found that the Government has proven by a preponderance of the evidence that Defendant presents a risk of flight, *see* Part III(A) of this Decision and Order, *supra*, this factor weighs in favor of the Government.

Considering all of these factors, the Court finds, as did Magistrate Judge Scott, that Defendant's detention has not yet run afoul of his constitutional rights.

**C.   ALTHOUGH A FLIGHT RISK, THERE ARE CONDITIONS WHICH REASONABLY WILL ASSURE THE PRESENCE OF DEFENDANT AT TRIAL IF RELEASED.**

Having determined that Defendant is a flight risk, the Court must consider whether there are conditions or a combination of conditions which reasonably will assure the presence of Defendant at trial if he is released.  *Shakur*, 817 F.2d 189 at 194-95 (citations omitted); *see also* 18 U.S.C. § 3142(e).  In making this determination, the Court not only examines the bail package proposed by Defendant, but also considers "whether a different, and more stringent, set of conditions could be crafted that would reasonably assure [Defendant's] appearance."  *United States v. Hollender*, No. 01-1350, 2001 U.S. App. LEXIS 20133, at *5 (2d Cir. Aug. 16, 2001); *see also United States v. Berrios-Berrios*, 791 F.2d 246, 250-51 (2d Cir. 1986).

Defendant has represented that his family is financially able to post $100,000 cash bail, but that they are not willing to use these funds unless Defendant is allowed to leave the United States.  Defendant requests that he be permitted to reside with his parents in the United Kingdom, but of course, there is no means by which Defendant would be effectively supervised outside the United States, and he already has a track record of disregarding directions of authorities in the United Kingdom and fleeing from that country without his passport.  Put simply, for the same reasons that Defendant presents a risk of flight, there are no conditions that would reasonably minimize that risk if he was

allowed to leave the United States (at least not any conditions that appear reasonably within the financial wherewithal of Defendant and his family).[1]

Although Defendant's family has apparently expressed an unwillingness to provide funds for Defendant's release if he is not allowed to leave this country, their alleged conditional support does not transform authorization for Defendant to leave this country into a reasonable condition of bail. Plainly Defendant and his family desire a bail condition that will allow him to leave the United States, but that preference cannot be reconciled with the extreme flight risk that Defendant presents. The fact is that Defendant's family has the financial resources and willingness to post cash bail of up to $100,000, and the Court will consider those financial resources when setting reasonable conditions that would allow for Defendant's release.

While an amount less than $100,000 cash bail was explored when it appeared that Defendant would need to pay for his living expenses and costs while remaining within this country, it now appears that any such costs would be eliminated while Defendant resides at the BCM. Nonetheless, there undoubtedly would continue to be some costs that Defendant may incur, even those related to the cost of electronic monitoring. In addition, the Court finds that cash bail of $75,000, under the circumstances, would be sufficient to secure Defendant's appearance at subsequent court proceedings, with other

---

[1] As even the Government acknowledged, there may be a significant financial amount that could be posted to secure Defendant's appearance and allow him to leave the United States, but that amount is far in excess of the $100,000 proposed by Defendant. The Court is cognizant that, pursuant to 18 U.S.C. § 1342(c), a "judicial officer may not impose a financial condition that results in pretrial detention of the person." *See* 18 U.S.C. § 1342(c)(2).

appropriate conditions, including requiring Defendant to remain in the United States and relinquish his passport, electronic monitoring of Defendant, and other appropriate conditions.   For the reasons articulated above, the Court finds that Defendant may be released upon the following conditions:

1.      Defendant shall post a seventy-five thousand dollar ($75,000) cash bond fully secured by cash deposited with the Clerk of the Court;

2.      Defendant shall report within 24 hours of release and as directed by the U.S. Probation Office ("USPO");

3.      Defendant shall avoid all contact, directly or indirectly, with any person(s) who are or who may become a potential victim or witness in this case;

4.      Defendant's passport shall be surrendered to the Clerk of the Court and Defendant shall not obtain a new passport or other international travel documents;

5.      Defendant shall be required to remain in the United States as approved by the Department of Homeland Security, and his travel shall be restricted to within Erie County, New York, unless Court permission is granted to travel elsewhere;

6.      Defendant shall reside at the Buffalo City Mission ("BCM") and comply with all rules, regulations and conditions as directed by the BCM staff, or at such other alternative verifiable address as approved by the Court and he shall not move without prior approval of the Court;

7.      Defendant shall abide by all conditions of the Home Confinement Program to be monitored electronically in a manner to be approved by the Court and/or the USPO,

he shall be subjected to home detention, and he shall contribute to the cost of services (co-pay) in an amount to be determined by the USPO;

8. Defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with electronic monitoring which is required as a condition of release;

9. Defendant shall not possess any firearms or other destructive devices; and

10. Defendant shall report within 72 hours, to the USPO any contact with any law enforcement personnel, including but not limited to any arrest, questioning or traffic stop.

## IV.   SEVERANCE MOTION

Rule 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Here, the Indictment alleges a common scheme and conspiracy to defraud individuals through the sale of "nearly worthless restricted shares of over-the-counter penny stock" which were sold at inflated prices to investors as freely traded shares, without telling investors about the stock restrictions. Defendant and co-defendant Wrobel were the alleged masterminds behind the alleged $5 million fraudulent scheme, purportedly running a telemarketing operation, sometimes referred to as a "boiler room" through which they and the other defendants operated the alleged criminal scheme. (*See* Dkt. 1). Thus, it appears evident based upon the allegations in the Indictment that the defendants have been properly joined pursuant to Rule 8(b). *See United States v. Uccio*, 917 F.2d 80, 87 (2d Cir. 1990) ("It is an

'established rule' that 'a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).'") (citation omitted).

Here, Defendant contends that notwithstanding the proper joinder, a severance is warranted pursuant to Fed. R. Crim. P. 14 because he is being prejudiced by his pretrial detention and inability to move forward with an immediate trial, due to his co-defendants' desire to file and pursue various pretrial motions. Pursuant to Rule 14, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." *See* Fed. R. Crim. P. 14(a). "From the text of the Rule, and from the cases decided thereunder, it appears that the principal prejudice the Rule was written to avert was prejudice inhering in the joint trial of counts or defendants, rather than the prejudice to one defendant resulting simply from having to wait until others are ready for trial." *United States v. El-Gabrowny*, No. S3 93 Cr. 181 (MBM), 1994 U.S. Dist. LEXIS 1878, at *2 (S.D.N.Y. Feb. 23, 1994).

The decision to sever a trial pursuant to Fed. R. Crim. P. 14 is "confided to the sound discretion of the trial court." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003). "Before granting a request for a severance, the party requesting the severance must demonstrate substantial prejudice: 'When defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

- 19 -

innocence.'" *United States v. Astra Motor Cars*, 352 F. Supp. 2d 367, 369-70 (E.D.N.Y. 2005) (quoting *Zafiro v. United States,* 506 U.S. 534, 539 (1993)); *see also United States v. Friedman,* 854 F.2d 535, 563 (2d Cir. 1988) ("The defendant must show that he or she suffered prejudice so substantial as to amount to a 'miscarriage of justice.'") (citation omitted).

There is a powerful presumption in favor of joint trials of defendants indicted together based upon the underlying policies of efficiency, avoiding inconsistent verdicts, providing a "more accurate assessment of relative culpability," avoiding victims and witnesses having to testify repeatedly, and avoiding the random favoring of "the last-tried defendants who have the advantage of knowing the prosecutor's case beforehand." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991). The Second Circuit Court of Appeals has instructed that "[c]onsiderations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together," and "[j]oint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy. . . ." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (citations omitted); *see also United States v. Van Sichem*, No. 89 Cr. 813 (KMW), 1990 U.S. Dist. LEXIS 3600, at *3 (S.D.N.Y. Apr. 2, 1990) ("There is a strong presumption in favor of joint trials for jointly indicted defendants, particularly where, as here, the 'crimes charged involve a common scheme or plan.'") (quoting *United States v. Girard*, 601 F.2d 69, 72 (2d Cir. 1979)). Indeed, "joint trials serve the interests of the government, the accused, and the public by eliminating the additional expense and repetition associated

with successive prosecutions." *Id.* at *3 (citing *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977)).

Defendant contends that he is entitled to severance because he has been in custody in the United States since March 2013, when he was apprehended and arraigned, while most of his co-defendants have remained released on bail pending trial, and that his detention violates his right to a speedy trial. (Dkt. 337 at 3; Dkt. 357 at 7). Defendant acknowledges that jointly-indicted defendants are governed by a single speedy trial clock, and delay attributable to any one defendant is charged against the single clock. *See United States v. Pena*, 793 F.2d 486, 489-90 (2d Cir. 1986). Time is excluded from the speedy trial clock where there is "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). "Congress has acknowledged that the purpose of Section 3161(h)(6) of the Speedy Trial Act was to ensure that the rules of severance were not altered, and that the government was not forced to prosecute the first defendant ready for trial separately or be subject to a speedy trial dismissal action. . . . Thus, reasonable speedy trial time should be excluded when necessary to enable joint trials to go forward." *United States v. Lockwood*, No. 11-CR-085, 2012 U.S. Dist. LEXIS 176208, at *6-7 (W.D.N.Y. Dec. 12, 2012) (citing *Pena*, 793 F.2d at 489).

In a multi-defendant case where the defendant makes a severance motion, "the court must examine the reasonableness of any delay caused by a co-defendant before time under the Speedy Trial Clock can be excluded as against the complaining defendant." *Id.* The Second Circuit has held that a defendant is not entitled to the benefit

of the reasonableness requirement until he moves for a severance. *United States v. Vasquez*, 918 F.2d 329, 337 (2d Cir. 1990). The reasonableness requirement must be assessed "in light of the strong presumption in favor of joint trials." *Van Sichem*, 1990 U.S. Dist. LEXIS 3600, at *5.

Defendant first requested a speedy trial at an appearance before Judge Scott on January 8, 2015 (Dkt. 274), and he did not file a severance motion until June 30, 2015 (Dkt. 337). Pretrial motions are presently scheduled to be filed by December 30, 2015, and Magistrate Judge Scott is scheduled to hear oral argument on pretrial motions on February 11, 2016. (Dkt. 377). Time has been excluded in the interest of justice to review the significant discovery produced by the Government, consisting of more than 1.5 million pages of documents, and prepare pretrial motions. For instance, in the most recent motion filed by one of Defendant's co-defendants seeking an extension of time to file pretrial motions to December 30, 2015, that co-defendant's counsel represented that he "has been diligently working through the voluminous discovery" in the case, but because of various reasons articulated in his submission to the Court, he requires additional time to prepare and file pretrial motions. (Dkt. 375).

When a defendant's "sole basis in moving for severance is the anticipated length of his pre-trial detention . . . incarceration alone will not support a claim of prejudice sufficient to warrant severing him from the other defendants in [his] case." *Lockwood*, 2012 U.S. Dist. LEXIS 176208, at *6 (fact that the defendant was ready to proceed to trial sooner than the trial date set by the court did not mandate a severance, because he has not demonstrated that his trial rights would be compromised, or that the jury would

be unable to make a reliable judgment of his guilt or innocence).  Rather, if a defendant seeks release from pretrial detention, "his claims [are] more appropriately raised in an application for bail."  *Id.*; *see also United States v. Vega*, 309 F. Supp. 2d 609, 615 n.5 (S.D.N.Y. 2004); *Gabrowny*, 1994 U.S. Dist. LEXIS 1878, at *4.

Defendant's arguments in support of his motion for bail and his motion for a severance are identical, because the sole reason raised by Defendant for a severance is the fact that he remains in custody during the pre-trial stage of his case.  (*See* Dkt. 337 at 4; Dkt. 357 at 6).  As referenced above, bail has been granted to Defendant and reasonable conditions have been set.  Therefore, Defendant's sole basis for seeking a severance is moot.

In addition, even if bail had not been granted, the fact that Defendant will be incarcerated while he is awaiting trial "is not enough to overcome the strong interests in fairness, judicial economy and judicial efficiency, which would be best served by [a combined trial] of defendants who were indicted together and whose charges all arise out of the same set of operative facts."  *Lockwood*, 2012 U.S. Dist. LEXIS 176208 at *10.  *See also Astra Motor Cars*, 352 F. Supp. 2d at 370 ("Defendant has not demonstrated any reason as to why he is prejudiced by a joint trial, except to remind this Court that he is incarcerated awaiting trial.  As incarceration alone is not a factor addressed by either Rule 8 or 14, this argument has no merit."); *United States v. Vega*, 309 F. Supp. 2d at 615 n.5 (where the defendant's counsel requested that the court consider the difficulty of scheduling a multi-defendant trial in deciding a motion for a severance, noting that "the Supreme Court has instructed that severance motions should be granted only if there is a

serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence," and that "[i]f [the defendant] claims that the length of his pretrial detention violates his right to due process, his remedy would be an application for pretrial release, not a severance motion."); *Schlegel*, No. 06-CR-550, 2009 U.S. Dist. LEXIS 20912, at *14-17 (E.D.N.Y. Mar. 16, 2009) (right to a speedy trial does not mandate severance; a defendant cannot contribute to or request a delay, and simultaneously argue that the delay violates her speedy trial rights); *United States v. El-Gabrowny*, 1994 U.S. Dist. LEXIS 1878, at *4 (where the defendant was not seeking severance based on any claim of prejudice resulting from a joint trial, but rather argued that the prejudice is the denial of a speedy trial, his severance motion was substantially a reargument on the points raised and decided against him in connection with his bail application).

Although Defendant has not sought a severance based upon the number of defendants indicted and/or the potential of a lengthy trial, the Court is cognizant that the Second Circuit Court of Appeals has instructed that in cases involving lengthy trials of more than four months and ten or more defendants, a district judge should abide by certain "benchmarks" in exercising her discretion to sever the trial. *See United States v. Casamento*, 887 F.2d 1141, 1152 (2d Cir. 1989); *see also United States v. Dinome*, 954 F.2d 839, 842 (2d Cir. 1993) ("[t]here is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence.").

This case is still in the pretrial stage, and its scope may be narrowed through stipulations, pretrial motions, and plea agreements prior to trial. *See United States v. Koschtschuk*, No. 09-CR-0096(S)(M), 2010 U.S. Dist. LEXIS 13105, at *18 (W.D.N.Y. Feb. 16, 2010) (denying motion for severance as premature, because "the number of defendants and issues to be tried may change as the case approaches trial."). Because the sole basis raised by Defendant for a severance is the fact that he remains in custody during the pre-trial stage of the case, his motion is denied without prejudice. Following the Court's decision on pretrial motions and as the case approaches trial, Defendant may renew his motion for severance if appropriate based upon the conditions present at that time.

## V.   CONCLUSION

For the foregoing reasons, Magistrate Judge Scott's Decision and Order denying without prejudice Defendant's motion for release from custody, with leave to renew on March 1, 2016, is reversed. Defendant may be released pursuant to the following conditions:

1.     Defendant shall post a seventy-five thousand dollar ($75,000) cash bond fully secured by cash deposited with the Clerk of the Court;

2.     Defendant shall report within 24 hours of release and as directed by the U.S. Probation Office ("USPO");

3.     Defendant shall avoid all contact, directly or indirectly, with any person(s) who are or who may become a potential victim or witness in this case;

4. Defendant's passport shall be surrendered to the Clerk of the Court and Defendant shall not obtain a new passport or other international travel documents;

5. Defendant shall be required to remain in the United States as approved by the Department of Homeland Security, and his travel shall be restricted to within Erie County, New York, unless Court permission is granted to travel elsewhere;

6. Defendant shall reside at the Buffalo City Mission ("BCM") and comply with all rules, regulations and conditions as directed by the BCM staff, or at such other alternative verifiable address as approved by the Court and he shall not move without prior approval of the Court;

7. Defendant shall abide by all conditions of the Home Confinement Program to be monitored electronically in a manner to be approved by the Court and/or the USPO, he shall be subjected to home detention, and he shall contribute to the cost of services (co-pay) in an amount to be determined by the USPO;

8. Defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with electronic monitoring which is required as a condition of release;

9. Defendant shall not possess any firearms or other destructive devices; and

10. Defendant shall report within 72 hours, to the USPO any contact with any law enforcement personnel, including but not limited to any arrest, questioning or traffic stop.

In addition, Defendant's motion for a severance is denied without prejudice.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: November 10, 2015
       Rochester, New York